NO. 07-08-0476-CR

 

IN THE COURT OF APPEALS

 

FOR THE SEVENTH DISTRICT OF TEXAS

 

AT AMARILLO

 

PANEL D

 

MAY 27, 2010

 

______________________________

 

 

PHILLIP DOYLE CHANEY, APPELLANT

 

V.

 

THE STATE OF TEXAS, APPELLEE

 

 

_________________________________

 

FROM THE 50TH DISTRICT COURT OF COTTLE COUNTY;

 

NO. 2834; HONORABLE WILLIAM H. HEATLY, JUDGE

 

_______________________________

 

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

OPINION

The contention that an injury can amount to a crime
only when inflicted by intention is no provincial or transient notion.  It is as universal and persistent in mature
systems of law as belief in freedom of the human will and a consequent ability
and duty of the normal individual to choose between good and evil.

                        Justice
Robert H. Jackson, United States Supreme Court[1]

           Appellant, Phillip Doyle Chaney, was
convicted by a jury of murder with an affirmative finding on use of a deadly weapon,
to-wit: a firearm.  Punishment was
assessed at twenty-three years confinement. 
By his original brief, Appellant presented four points of error alleging
error by the trial court (1) during jury selection by making remarks to the
panel reasonably calculated to benefit the State or prejudice him by denying
him his rights under article 35.15 of the Texas Code of Criminal Procedure; (2)
by overruling his objection to testimony by State's witness, Ranger Jay Foster,
regarding his intent to kill, thereby affecting his substantial rights; (3) in
letting the jury's verdict of murder stand and violating his rights in so doing
because the evidence of his intentional or knowing commission of murder is
legally insufficient and (4) factually insufficient.  

           Following
submission of this appeal, this Court directed the parties to brief unassigned
error regarding the possibility of charge error in the definition of
"intentional" as it relates to the result oriented offense of murder.[2]
 As a result of this Court's directive,
Appellant raised two additional points of error, to-wit: (5) the trial court
committed fundamental error that egregiously harmed him by erroneously defining
the culpable mental states of "intentional" and "knowing"
in the abstract portion of the guilt-innocence charge; and (6) the trial court
violated his due process rights by allowing inadmissible testimony and argument
focusing on the intentional or knowing nature of his conduct as opposed to the
result of his conduct.  

           As to the
first four points, the State contends the trial court did not err in its
remarks, Appellant did not preserve an objection as to Ranger Foster's
testimony, and the evidence was both legally and factually sufficient.  As to the last two points, while the State candidly
concedes that the trial court erred by including the full statutory definition
of "knowingly" found in section 6.03(b) of the Texas Penal Code in
the abstract portion of the charge,[3]
it contends that Appellant did not suffer egregious harm because the application
paragraph of the court's charge correctly instructed the jury on the
appropriate mens rea.  The State further contends that Appellant's
allegations of cumulative errors were unobjected to
and thus not preserved for review.  Finally,
the State contends Appellant's due process rights were not violated.

           For the
reasons to follow, we reverse the judgment of the trial court and remand this
matter for further proceedings consistent with this opinion.

Factual Background

            In February 2005, when Appellant was eighteen years old, he began working
as a correctional officer for the Institutional Division of the Texas
Department of Criminal Justice at the T.L. Roach Unit in Childress, Texas.  Appellant lived in Paducah with his younger
brother, Bo, and their mother.  Two years
later, on the afternoon of March 5, 2007, fifteen year old Lukas Taylor, the
victim, and Christopher Dominguez, Jr. skipped baseball practice, bought two marihuana
joints, and drove to the Chaney home to spend time with their friend Bo.  Another friend, Presciliano
Perez, arrived later.  

           While
Appellant was playing a video game, Lukas, who was sitting in a nearby rocker recliner,
opened Appellant's gun case, removed a .44 magnum handgun, unloaded it, spun
the cylinder, and admired it.  Appellant
repeatedly asked him to reload the firearm and put it up.  Eventually Lukas reloaded the firearm, but
before he was able to put it up,[4]
Appellant approached him, they struggled, and the firearm discharged, shooting Lukas
in the chest.  

           According to
the eyewitnesses, Appellant was not angry and he and Lukas did not argue or
fight.  Christopher testified that when
Appellant was asking Lukas to put the gun up, they were "joking around,
mouthing off."  During direct
examination, Christopher was asked whether Appellant or Lukas were
"mad," to which he answered "[n]o."  

           Appellant's
brother, Bo, testified that when the struggle for the gun began, the barrel of
the gun was pointed toward a wall then speculated that the gun got turned
around during the struggle.  None of the
eyewitnesses saw whose finger was on the trigger and forensics was unable to
establish that fact. 

           After the
shooting, Bo called 911 and began CPR on Lukas, while Appellant went outside.  The 911 call was made at 6:34 p.m.  Law enforcement and emergency personnel
responded.  Lukas was transported by
ambulance to a hospital in Childress, where he later died.  

           At
approximately 7:01 p.m., Texas Department of Public Safety Trooper Keith Bowles
contacted Texas Ranger Jay Foster about the incident.  Foster instructed Bowles to secure the scene
and the witnesses.  Foster then contacted
the Paducah Chief of Police and advised him to inform Appellant that he was not
under arrest.  Appellant was taken to the
police department where he voluntarily gave a statement.[5]  At that time he was unaware that Lukas had
died.

           After Ranger Foster
processed the scene, he went to the police department and met with
Appellant.  Foster then began a month-long
investigation which included attending the autopsy, interviewing witnesses,
emergency medical responders, and emergency room personnel.  Eventually, he obtained an arrest warrant for
Appellant for the offense of manslaughter.

           Upon further
investigation and interviews with Appellant's supervisor at the Roach Unit and
Sergeant Shannon Betts, the firearms instructor for correctional officers, Ranger
Foster became convinced that Appellant's conduct constituted murder rather than
manslaughter.  Based upon Appellant's
firearms training and experience, and based upon Ranger Foster's understanding
of the law as it pertained to the culpable mental states of knowingly and
recklessly, he concluded that Appellant should be held to the higher standard
of knowingly because he was not an "ordinary person."  Accordingly, he presented the case to the
grand jury as a murder, and they returned the instant indictment.   

           After a
lengthy and difficult voir dire, Appellant was tried
and convicted of murder.  The jury
assessed his sentence at twenty-three years confinement and this appeal
followed.

            Of
Appellant's six points of error, we will address two.  Because Appellant's third point, legal
sufficiency, would provide him the greatest relief, i.e., an acquittal, we will
address that contention first.[6]  Finding the evidence legally sufficient, we
will next address his fifth point, charge error.  Because disposition of that point addresses
every issue necessary to a final disposition of the appeal,[7] we pretermit
Appellant's remaining points of error.

I.         Legal Sufficiency

           A.          Standard
of Review

           It is a
fundamental rule of criminal law that one cannot be convicted of a crime unless
it is shown beyond a reasonable doubt that the defendant committed each element
of the alleged offense.  U.S. Const. amend. XIV; Tex. Code Crim. Proc. Ann.
art. 38.03 (Vernon Supp. 2009); Tex. Penal Code Ann. '
2.01 (Vernon 2003).  Evidence is
legally insufficient if, when viewed in a light most favorable to the
prosecution, a rational trier of fact could not have
found each element of the offense beyond a reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 318, 99 S.Ct. 2781, 2789, 61 L.Ed.2d
560, 573 (1979); Laster v. State, 275
S.W.3d 512, 517 (Tex.Crim.App. 2009).  In conducting a legal sufficiency review, we
must evaluate all of the evidence in the record, both direct and
circumstantial, whether admissible or inadmissible.  Dewberry
v. State, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999),
cert. denied, 529 U.S. 1131, 120 S.Ct. 2008,
146 L.Ed.2d 958 (2000).  This standard
gives full play to the responsibility of the trier of
fact to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts. Jackson, 443
U.S. at 319.  In measuring the
sufficiency of the evidence to sustain a conviction, we measure the elements of
the offense as defined by a hypothetically correct jury charge.  Malik v. State, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). 
Such a charge is one that accurately sets out the law, is authorized by
the indictment, does not necessarily restrict the State=s theories of liability, and
adequately describes the particular offense for which the defendant was
tried.  Id.  For purposes of legal sufficiency, the
quantum of proof necessary to support a conviction is a minimum threshold.    

           Appellate
courts are ill-equipped to weigh the evidence; unlike the factfinderBwho can observe facial expressions
and hear voice inflections first-handCan appellate court is limited to the cold record.  Laster, 275 S.W.3d at 517. 
Our role on appeal is restricted to guarding against the rare occurrence
when a factfinder does not act rationally.  Id. 
After giving proper deference to the factfinder=s role, we will uphold the verdict
unless a rational factfinder must have had reasonable
doubt as to any essential element.  Id. at 518.

           B.          Analysis

           To support a
conviction for murder, the State was required to prove that Appellant intentionally
or knowingly caused the victim's death by shooting him with a deadly weapon, to-wit:
a firearm.  See Tex. Penal Code Ann. § 19.02(b)(1) (Vernon
2003) and § 1.07(a)(17)(A) (Vernon Supp. 2009). 


           Section 6.03
of the Penal Code defines the culpable mental states of Aintentionally@ and Aknowingly@ as follows:  

            (a) A person acts
intentionally, or with intent, with respect to the nature of his conduct or to
a result of his conduct when it is his conscious objective or desire to engage
in the conduct or cause the result.

            (b) A person acts
knowingly, or with knowledge, with respect to the nature of his conduct or to
circumstances surrounding his conduct when he is aware of the nature of his
conduct or that the circumstances exist. 
A person acts knowingly, or with knowledge, with respect to a result of
his conduct when he is aware that his conduct is reasonably certain to cause
the result.

 

           Murder, whether
intentionally or knowingly committed, is a result oriented offense.  Cook v.
State, 884 S.W.2d 485, 490 (Tex.Crim.App.
1994).  As such, the full statutory
definitions of intentional and knowing do not apply.  Instead, the State must establish that the
accused intended the result, i.e., death, or that he was aware that his conduct
was reasonably certain to cause that result. 
Id.  

           A firearm is a deadly weapon per
se.  See
Tex. Penal Code Ann. § 1.07(a)(17)(A).  See also Ex Parte Huskins, 176 S.W.3d 818, 820 (Tex.Crim.App.
2005).  

           According to
the evidence presented, Appellant and the victim struggled over a loaded .44
magnum handgun which discharged, shooting the victim in the chest, resulting in
his death.  Although none of the
eyewitnesses could state what caused the handgun to discharge, Ranger Foster
opined that Appellant had pulled the trigger during that struggle and that the
victim could not have pulled the trigger. 
Although he unequivocally testified that the shooting was not
intentional, in his opinion, Appellant knowingly committed murder.   According to Ranger Foster's testimony, no
matter how accidental a shooting incident might have been, anyone trained in
firearms would not be an "ordinary person" and would, therefore, be
incapable of manslaughter or criminally negligent homicide because they would
always be aware that careless conduct involving a firearm was reasonably
certain to cause death.  Although Ranger
Foster's testimony was, in part, based upon an incorrect legal premise, his
testimony did include statements which were legally sufficient to support the
jury's decision to convict Appellant of murder.[8]  The legal sufficiency of the evidence was
further supported by Christopher's testimony that Appellant "caused"
the victim's death and Presciliano's testimony that Appellant
"caused" the shooting.   Accordingly, point of error three is
overruled.

II.        The Court's Charge

           As
stated above, murder, whether intentionally or knowingly committed, is a result
oriented offense.  Cook, 884 S.W.2d at 490.  Because the applicable mental state relates to
the result of the conduct only, i.e., causing
of the death, Schroeder v. State,
123 S.W.3d 398, 400 (Tex.Crim.App. 2003), a charge
which contains the full statutory definition is erroneous.  See Cook,
884 S.W.2d at 491. 
See also Alvarado v. State, 704
S.W.2d 36, 40 (Tex.Crim.App. 1985).  The court's charge for a result oriented
offense such as murder should not allow a jury to convict a person based solely
on a finding that the accused intentionally or knowingly engaged in conduct
which happened to cause death.  See generally Green v. State,
891 S.W.2d 289, 294 (Tex.App.--Houston [1st Dist.]
1994, pet. ref'd).  

           Here, the
abstract portion of the court's charge contained the full statutory definitions
of intentional and knowing as they appear in section 6.03(a) and (b) of the
Texas Penal Code.  Accordingly, the
charge allowed the jury to do that which the law did not -- find him guilty of
murder based on his conduct, rather than on intending or knowing the prohibited
result -- death.  As such, the trial
court erred in the submission of its charge to the jury.  Cook, 884 S.W.2d at 491.  However, merely finding error in the court's
charge begins, rather than ends, our inquiry. 
Almanza v. State, 686 S.W.2d
157, 174 (Tex.Crim.App. 1984) (op. on reh'g).  If
error exists, we must then analyze the error for harm.  Ngo v. State, 175 S.W.3d 738, 743 (Tex.Crim.App.
2005).  

           A.          Standard
of Review

           Appellant
did not object to the trial court's charge error.  This failure to preserve jury charge error is
not, however, an absolute bar to appellate review.   Warner v. State, 245 S.W.3d 458, 461 (Tex.Crim.App.
2008).  Rather, failure to
preserve error establishes the degree of harm necessary for reversal.  Id.  Unobjected to
charge error is reversible if it is so egregious and creates such harm that it
deprives the accused of a "fair and impartial trial."  Almanza, 686 S.W.2d at 172. 
Errors that results in egregious harm are those kinds of errors that
affect "'the very basis of the case,' 'deprive the defendant of a valuable
right,' or 'vitally affect a defensive theory.'"  See Hutch
v. State, 922 S.W.2d 166, 171 (Tex.Crim.App.
1996) (quoting Almanza,
686 S.W.2d at 172). See also Sanchez v.
State, 209 S.W.3d 117, 121 (Tex.Crim.App. 2006).  

           When
reviewing harm resulting from charge error, an appellate court must determine harm
in light of (1) the entire jury charge, (2) the state of the evidence,
including contested issues and the weight of probative evidence, (3) the
arguments of counsel, and (4) any other relevant information revealed by the
record of the trial as a whole.  See Almanza, 686 S.W.2d at 171.  See also Ngo, 175 S.W.3d at 750 n.48.  Additionally,
there is no burden of proof or persuasion in a harm analysis conducted under Almanza.  Warner,
245 S.W.3d at 464.

           




 

B.       Harm Analysis

            1.         The
Entire Jury Charge

           While the
abstract definitions of intentional and knowing contained in the court's charge
erroneously included references to the nature of Appellant's conduct, the
application paragraph of the court's charge correctly limited the jury's
consideration to the result of his conduct. 
Accordingly, the State relies heavily on Medina v. State, 7 S.W.3d 633, 640 (Tex.Crim.App.
1999), and Richie v. State, 149
S.W.3d 856, 857 (Tex.App.--Amarillo 2004, no pet.),
for the proposition that harm can never be egregious when it is shown that an
appellant fails to make an objection at trial and the charge correctly
instructs the jury in the application paragraph.  

           Despite its
earlier holding in Medina, in 2006 the
Court of Criminal Appeals, in granting an appellant's petition for
discretionary review in a per curiam, unpublished
opinion, held that an appellate court improperly limits its harm analysis when
it does so without addressing the other Almanza factors.  See
Dougherty v. State, No. PD-1311-05, 2006 WL 475802 (Tex.Crim.App. March 1, 2006) (per curiam) (not designated for publication).  In Dougherty,
the appellate court's decision that error in the abstract portion of a jury
charge did not cause egregious harm when the application paragraph properly
instructed the jury was vacated and remanded for consideration of the remaining
Almanza
factors.  Although the appellate court
had correctly set forth the standard for assessing harm, the high Court
determined that a harm analysis based on charge error could not be based solely
on the jury charge but must instead include consideration of all four Almanza factors.  Id.  But see
Dougherty v. State, 188 S.W.3d 670 (Tex.Crim.App.
2006) (Keller, P.J. dissenting) (concluding that appellant's petition should
have been refused because an erroneous abstract paragraph is completely
remedied by a properly limited application paragraph without the necessity of
considering all four Almanza
factors).  

           In Richie, 149 S.W.3d at 857, this Court
followed Medina and, without
analyzing all four factors, found that Richie had not suffered egregious harm
where the application paragraph properly instructed the jury on the correct
culpable mental state.  Richie,
however, predates Dougherty, and in
light thereof, we deem it appropriate to consider all of the Almanza factors in determining harm.[9]   

           In that vein,
we note that the Charge of the Court
was a multifarious charge including the lesser included offenses of
manslaughter[10]
and criminally negligent homicide.[11]  Again, the abstract definition of the
appropriate culpable mental states included the full statutory definitions of
reckless and criminal negligence.  While
the distinction between "nature of conduct" and "result of
conduct" becomes blurred with respect to offenses based upon a reckless or
criminally negligent mens rea, the
inclusion of the full statutory definition of all four mental states, combined
with the State's argument that Appellant was not an "ordinary man," certainly
compounded the error.   

           Furthermore,
even though the State's witnesses had testified that Appellant did not
intentionally cause the victim's death, and the State acknowledged in its
closing arguments that it was only relying upon knowing for a murder
conviction, the charge of the court still allowed jurors to consider whether or
not Appellant committed murder by intentionally engaging in conduct.  Therefore, overall, a review of the entire
jury charge militates in favor of a finding of harm.

           2.          The State
of the Evidence

           From
the beginning, as it pertained to Appellant's culpable mental state, the
State's evidence focused on the nature of his conduct.  According to the State, because of his extensive
firearms training, Appellant could not have been guilty of the lesser offenses
of manslaughter or criminally negligent homicide because those offenses required
a culpable mental state which, according to the State's theory, only applied to
an "ordinary person."[12]   In reaching this conclusion, the State
relies heavily on the testimony of Ranger Foster.[13]  

           Of that
evidence which Appellant contested, and upon which the jury would be asked to
make determinations of probative value, the vast majority dealt with Appellant's
culpable mental state.  The State spent a
great deal of time establishing that, due to his firearms training, Appellant
was not an ordinary person, and that he must have fully understood that
wrestling over a loaded firearm was an extremely dangerous proposition. 

           Sergeant
Shannon Betts, who trained Appellant on use of firearms, testified that
Appellant had more firearms training than the ordinary citizen. In response to
numerous questions during direct examination, Ranger Foster emphatically
testified that Appellant was not an ordinary person because of his extensive
firearms training.  He further opined
that the culpable mental states of recklessness and criminal negligence simply did
not apply to Appellant for that reason.  

           During Ranger
Foster's direct testimony, the prosecutor recited the full statutory definition
of "knowingly" and asked the following question:

[Prosecutor]: So tell us your
feelings about how those facts apply.

[Ranger Foster]: Based on --

[Defense Counsel]: Objection,
Your Honor, invades the province of the jury. 
They're the ones that -- they are the ones that determine whether it was
intentional, knowing, reckless, or criminally negligent.

[Prosecutor]: Judge, if I may
respond.

[Court]: Yes.

[Prosecutor]: The Ranger is
testifying about why he charged this defendant with manslaughter and later changed
his mind as to what the offense was. 
He's entitled to say why he changed his mind and what the offense is and
why he charged him in that regard.

[Court]:
Your objection is overruled.  Go ahead,
Ranger.

           Later in his
testimony, again over objection,[14]
Ranger Foster explained why he increased the charge from manslaughter to murder:

[t]he part, as we said, that
went from manslaughter to murder was his background, his training as a
correctional officer.  He is held to a
higher degree of accountability, just such as myself
would be in a similar situation, and he is not an ordinary person.

 

           During cross-examination, Ranger
Foster clung to his opinion that a person who is trained to carry a weapon for
employment purposes is not an ordinary person for purposes of culpable mental
states.  He qualified his testimony to
prevent "blanket coverage" by testifying that whether a person should
be held to a higher standard "depend[s] on the amount of training and the
situation around it."

           Appellant's brother, Bo, testified
that Appellant was not "mad" and there was no arguing or fighting
between Appellant and Lukas.  Although
Christopher answered affirmatively during direct examination when asked if Appellant
"caused" the victim's death, he also testified that Appellant was not
mad and that Appellant and Lukas were "joking around."  Presciliano
testified during cross-examination that Appellant did not knowingly shoot Lukas
and agreed with defense counsel that the discharge of the firearm was an
unintentional act.  

           Lukas Taylor was shot during a
struggle for control of the firearm and other than Ranger Foster's opinion
testimony that Appellant committed murder, the State
did not present evidence that it was Appellant's purpose that Lukas would die
as a result of their confrontation. 
Accordingly, we conclude the evidence tending to support a finding that
Appellant caused the victim's death, a required element of the offense, is
"weak" and, considering conflicting evidence, is arguably
"against the great weight and preponderance of the evidence."  Laster, 275 S.W.3d at 518.[15]  Consequently, we find the second Almanza factor also
favors a finding of harm.    

           3.          The
Arguments of Counsel

           In his
opening argument, the prosecutor stated:

[Appellant] loved guns.  He owned numerous firearms, including
shotguns, pistols, and assault rifles. 
He had worked for about two years as a prison guard over at the Roach
Unit in Childress.  As a requirement for
his employment, he was trained in firearm proficiency.  As a requirement of his employment, he
learned how to use firearms with an emphasis on safety.  He was certified by the State of Texas as a
corrections officer.  So [Appellant] knew
how to safely handle guns.

But in spite of his training,
[Appellant] almost always kept his guns loaded and had a habit of pointing them
at people. . . .

* * *

[Appellant's] conduct caused the death of Lukas Taylor.

* * *

[B]ut
for the act and the conduct of
[Appellant], the shooting would not have occurred.

* * *

The
prosecutor then read the full statutory definitions of
"intentionally" and "knowingly" to the jury and continued:

[C]onduct is the core part of those definitions. . . .  It's the act and the conduct of [Appellant], [Appellant] alone, and that will prove the offense of murder.

 

(Emphasis
added).  The prosecutor's opening
argument contains misstatements of law. 
Murder is not proven by knowing conduct;
rather, section 19.02(b)(1) of the Texas Penal
Code criminalizes causing death.

           During his closing argument, the
prosecutor explained to the jury it was relying solely on the culpable mental
state of "knowingly" to establish murder.  Although he did reiterate the incorrect full
statutory definition of knowingly, his factual application only emphasized the
correct definition.  However, after
explaining knowingly, he continued his argument by incorrectly contending that
the culpable mental states of reckless and criminal negligence applied only to
an ordinary person.  Then, by arguing that
Appellant was not an ordinary person, he reasoned that the offenses of
manslaughter and criminally negligent homicide did not apply to Appellant.  This argument was not only misleading, it was
a misstatement of the law.

           After
the defense presented its closing argument, the prosecutor gave its final
argument.  In summarizing responses to
his questions by Bo, Christopher, and Presciliano, he
argued, "the acts and conduct of [Appellant] . . . but
for the acts and the conduct of this man, [Appellant], Lukas Taylor would still
be alive and there would never have been a shooting."  He then reminded the jury of Sergeant Betts's
testimony that Appellant is not an ordinary person because of his firearms
training.  Finally, in recalling Ranger
Foster's testimony, the prosecutor reiterated Foster's opinion that Appellant
was guilty of murder because he was not an ordinary person.  

           The prosecutor continued during his
closing argument: 

 [Prosecutor]: 
And I think he [Ranger Foster] did a good job and I don't want to
belabor the jury, because we've already talked about it, explaining to you why
his investigation revealed the crime of murder, in his opinion, and not a
manslaughter or criminal negligence.  And it all goes back -- a lot of it goes
back to the fact that [Appellant] is
just not an ordinary person.  He is a
person that is trained in firearms safety and firearms and knows a lot more
than an ordinary person.  He doesn't fit the definition for
manslaughter or criminal negligence.

(Emphasis added).

           In analyzing the third Almanza factor, the State asserts its arguments
were proper and that Appellant did not object to the definition of
"knowingly" during closing arguments. 
We disagree.  Just as with the
prosecutor's opening argument, his closing and final arguments also contain
misleading contentions and misstatements of law.  He emphasized that but for Appellant's conduct, the victim would still be alive
and he argued that the offenses of manslaughter and criminally negligent
homicide were simply inapplicable to Appellant because he was not an ordinary
man.

           Concluding that certain misstatements
of law were made by the prosecutor during opening and closing arguments which likely
would have mislead and confused the jury, we disagree with the State's assessment
of the third Almanza
factor and conclude that the improper arguments egregiously prejudiced
Appellant.

           4.          Any Other Relevant Information

           Finally, in assessing the fourth and
final Almanza
factor, any other relevant information, the State insists the jury needed to
understand the emphasis the State placed on Appellant's conduct.  The State asserts, "the
jury needed to understand the circumstances of the shooting and the training of
the appellant in order to understand that the appellant knew that Lukas Taylor
would die as a result of the appellant's actions."  

           In response
to the prosecutor's closing arguments, defense counsel argued that the State's
theory was that persons with firearms training are so extraordinary that any
unintentional discharge of a firearm causing death would constitute
murder.  Taken to its logical conclusion,
under the State's theory, an off-duty police officer, due to his firearms
training, would always be held to a higher standard than the "ordinary
person" and could not be found guilty of any offense less than murder,
even if his conduct was merely reckless or criminally negligent.  

           A statute is
interpreted in accordance with the plain meaning of its text, unless the plain
meaning leads to an absurd result that the Legislature could not possibly have
intended.  See Murray v. State, 302 S.W.3d 874, 877 (Tex.Crim.App. 2009). 
The prosecution's theory leads to an absurd result.  Neither the Texas Penal Code nor the Texas
Code of Criminal Procedure defines "ordinary person."  Furthermore, we have not found any authority
which imposes a higher standard of culpability for homicides committed by
persons with firearms training.  We decline
to adopt such a standard for assessing culpability in homicide cases.  To do so would amount to legislating from the
bench.  See Turner v. Cross, 83 S.W. 218, 188 S.W. 578, 579 (1892).[16]  Therefore, our analysis of the fourth Almanza likewise
weighs in favor of a finding of harm.

           In sum, the
erroneous abstract portion of the charge, the evidence presented by the State,
the prosecutor's opening and closing arguments, and the State's general theory
of the inapplicability of the culpable mental states of reckless and criminal
negligence to persons with firearms training, all emphasized the nature of
Appellant's conduct, thereby allowing the jury to believe they were authorized
to convict Appellant of murder based solely on their belief that he knowingly
or intentionally engaged in extremely dangerous conduct (wrestling a loaded firearm
away from Lukas Taylor), without requiring a finding that he intended or knew
that death would result.  This error was
only exacerbated by the misstatement of the law as it pertained to the
applicability of reckless and criminal negligence as culpable mental states
exclusively reserved to the acts of an "ordinary man."   These errors not only deprived Appellant of
a valuable right, the right to be tried in accordance with the law, they also
vitally affected his defensive theory, to-wit: that Lukas Taylor's death was
the result of reckless or criminally negligent conduct or was the result of a
terrible and tragic accident.  Based upon
the entire record of this case, we conclude that the trial court's charge error
caused Appellant egregious harm.  Point
of error five is sustained.

           C. 
Conclusion          

           Consequently,
the trial court's judgment is reversed and the cause is remanded to the trial
court for further proceedings.

 

                                                                                    Patrick
A. Pirtle

                                                                                          Justice

Quinn, C.J.,
dissenting.

Publish.











[1]
Morissette v. United States, 342 U.S. 246, 250, 72 S.Ct.
240, 92 L.Ed. 288 (1952).  





[2]Murder
is a "result of conduct" offense, which means that the culpable
mental state focuses on the result of the conduct, i.e., causing the death of
an individual; as opposed to a "nature of conduct" offense where the
focus is on the conduct itself.  Cook v. State, 884 S.W.2d 485, 491 (Tex.Crim.App. 1994).





[3]Although
the abstract portion of the Charge of the
Court also included the full statutory definition of
"intentional" found in §
6.03(a) of the Texas Penal Code, the State does not concede that the
trial court erred in that respect.  





[4]Presciliano testified that the victim put the gun up when
asked, but took it out a second time without unloading it.

 





[5]According
to Appellant's statement, he had recently acquired the .44 magnum and Lukas had
admired it on several occasions.  In his
statement, he wrote:

 

Lukas Taylor
reached between my couch and shelves and got my pistol box which contained a
.44 magnum pistol inside a holster. 
Lukas Taylor then opend [sic] the pistol
holster.  I then told Lukas Taylor to put
the pistol up, but he didn't, so I continued to tell Lukas Taylor to put up the
.44 magnum.  Lukas Taylor continued to
hold the .44 magnum so I got up to get it from Lukas Taylor and then Lukas
Taylor pulled the .44 magnum away from me and towards Lukas Taylor.  Lukas Taylor had his hand around the grip and
finger on the trigger of the .44 magnum when I grabbed the .44 magnum to put it
up.  Lukas Taylor then twisted the .44
magnum away from me and toward himself. 
At that time, the .44 magnum fired striking Lukas Taylor in the chest. .
. .





[6]Generally,
when a party presents multiple grounds for reversal, an appellate court should
first address those points that would afford the party the greatest
relief.  See Tex. R. App. P. 43.3;  See also Bradley Elec. v. Cigna Lloyds Ins.
Co.,  995 S.W.2d 657, 677 (Tex.
1999).

 





[7]Tex.
R. App. P. 47.1.





[8]In
his dissent, Chief Justice Quinn takes issue with the conclusion that the
evidence of guilt was legally sufficient to support a finding of guilt to the
offense of murder.  Finding Ranger
Foster's testimony incorrectly states the law, he logically concludes that a
jury does not act reasonably by adopting those misstatements.  While we agree that a jury should not base
its verdict upon an incorrect understanding of the law, from a legal
sufficiency analysis prospective, we must presume that the jury correctly
followed that portion of the trial court's instructions that did correctly
state the law.  Kirsh v. State, 306 S.W.3d 738, 748 n.33 (Tex.Crim.App. 2010). 
As discussed further in Section II, Ranger Foster's objectionable
testimony only emphasizes the egregious nature of the misstatement of law found
in the Court's Charge in this case.





[9]Furthermore,
we note that, in light of Dougherty, the
State analyzed all four Almanza
factors in its Supplemental Brief. 

 





[10]See Tex. Penal Code Ann. § 19.04 (Vernon 2003).

 





[11]See Tex. Penal Code Ann. § 19.05 (Vernon 2003).





[12]The
culpable mental states of recklessness and criminal negligence provide that the
actor's risk "constitutes a gross deviation from the standard of care that
an ordinary person would exercise . .
. as viewed from the actor's standpoint." 
(Emphasis added).

 





[13]Although
the admissibility of portions of Ranger Foster's testimony was raised by
Appellant in his second point of error, for purposes of egregious harm review,
we need not address that contention.





[14]Defense
counsel objected, "asked and answered for the
third time, Your Honor."  The
objection was overruled.

 





[15]A
conviction is not subject to reversal on the basis of factually insufficient
evidence unless: (1) the evidence supporting the conviction is Atoo
weak@ to support the factfinder=s
verdict, or (2) considering conflicting evidence, the factfinder=s
verdict is Aagainst the great weight and
preponderance of the evidence.@  Although factual sufficiency was raised by
Appellant in his fourth point of error, we need not fully address that issue
for purposes of egregious harm review.

 





[16]It
is the duty of a court to administer the law as it is written, and not to make
the law; and however harsh a statute may seem to be, or whatever may seem to be
its omissions, courts cannot on such considerations by construction retrain its
operation or make it apply to cases to which it does not apply, without
assuming functions that pertain solely to the legislative department of the
government.